May it please the Court, Mark Turner, appearing on behalf of the plaintiff, Kylie Kinney, in this case. This is a case alleging claims of violations of the Americans with Disabilities Act and the Oregon counterpart statute, as well as originally common law lawful discharge. And the fundamental error which runs through the trial court's decision granting summary judgment here is consistent weighing of disputed issues of fact against the plaintiff and in favor of the defendant, contrary to the rules in the case law of every circuit in this nation. Ms. Kinney, an employee of Twain TV in Portland, suffers from lupus, which is a systemic and She proposed this fact to her employer because of concern about how it would affect her employment situation, one of the reasons, I believe, why we have the Americans with Disabilities Act in the first place, because of such discrimination. She had performed well and was given the opportunity to move into another position. When it was presented to her, it was presented as the possibility of obtaining additional experience that could help her to move up in the industry in the future. And at this point, I think we find what is the biggest issue of disputed facts in this case, which was decided by the trial court improperly and which underlies the trial court's decision against the plaintiff on every element of and every type of claim that she brings under the act. Because the big factual issue here is, did the defendant, as it asserts, decide before ever meeting with the plaintiff and telling Ms. Kinney that this additional or this new opportunity was there, did the defendant decide to eliminate that cost-saving program or regime that was being implemented? What evidence is there that that isn't what happened? Well, Your Honor, I believe that there's a substantial amount of evidence. In large part, the evidence is the absence of evidence, if you will. But to me, the most significant piece of evidence is the existence of financial statements, projections, that the defendant produced that show, and these were produced after this alleged decision was made to eliminate her position, but continue to show her in that same position earning the same salary that she was earning. Now, why is that evidence, and what is the problem with that? Clearly, the document taken on its face indicates that there was no preexisting decision to eliminate the position. It shows going forward a number of months, Ms. Kinney continuing in her existing role. Okay, you better spell out why that's so, because in the normal event, I mean, life is lived downstream on the government's records are going to show that I'm in this position, I'm going to get paid for it. Yes. So what does that show? Well, I think the difference would be if I pulled a financial statement produced a month ago that showed that, you could say, well, that's irrelevant, it is of no value because nobody knew that you would be leaving your position. These documents were produced after the alleged decision was made. So, Your Honor, if you had, if you announced it. Well, I'm sure they were produced after it. But, I mean, the point is that I've forgotten the guy's name who held the position of the daytime. General manager. No, no, no. The guy who in fact quit. I'm sorry. I've just absolutely lost his peck. When Peck quit, that opened up that position. Now, I don't know what the financials show about him. I suspect the same thing. So he quit, that opened that position. They had the obvious person to move into that position. They were able to collapse two jobs into one. And that's what happened. Well, let me pose this analysis because we are in a position where the trial court should have, and this court should as well, draw every inference in favor of the plaintiff. Now, we live in a post Sarbanes-Oxley world where a publicly traded corporation is trying to tell this court and told the trial court, oh, we produce financial projections and statements willy-nilly without paying attention to the accuracy of those. We have a computer problem, so we have things in there that may not be accurate. And it takes us a few months to catch up. Now, I would submit that a legitimate inference to draw from that is it is a post hoc rationalization. It's like a case of circumstantial evidence where I have umpteen pieces of evidence indicating that someone committed a crime, but I don't have an eyewitness. Well, what's in a post hoc rationalization for? Explaining away the document. No. Okay. Go ahead. The conversation with the plaintiff in which she was told that she was to work the night shift occurred on a certain day, and then the financial that you're talking about is dated a few days later. Not only produced later, but by produced you mean generated within the company, not produced in the discovery context. Yes. And it bears a date, what, two or three days after this conversation. Am I right? Yes. And it is labeled revised or amended or something like that, is it? I believe so. Does anybody have the original or any antecedent document to that one? It's not in this record. Not that I'm aware of, Judge. But it's referred to as, am I right, it's referred to as if it's a sequel or an amended, doesn't it use that term, amended or revised or something like that? I believe so. I've forgotten. I don't have it in front of me, but I think that that's. Now, this plaintiff continued to work a few days after this conversation. Yes. And in fact, in fact, the position did not exist after she left. Yes. And it's solely, your sole issue with respect to that is when the decision was made to eliminate the position, is it not? Yes. Otherwise, that's a non-event. I believe that's correct. Okay. I understand you. Now, there's evidence, of course, to the contrary. That is that the decision was made earlier. There's sworn testimony to that effect. Is there any record, any written record of the decision having been made earlier? No. Okay. And that, when I said that some of the most persuasive evidence, in my view, of the post-hoc explanation of this is the absence of any kind of written record. The defendant has said this was part of a $300-and-some-odd-thousand-dollar cost-saving measure. Yes. And the only contemporaneous documentation of any cost-saving measure that was produced in this case was some emails that discussed changing the coffee service at Coin TV. Now, if we're talking about a corporation that has, according to their testimony, was given a directive by the owner to implement substantial cost savings, there's not a single shred of paper that shows budget analyses, different kinds of things they could do. The only thing that we've seen, really, for this $350,000 cost saving is the elimination of this position and the change of the coffee service. Right. Now, the court excluded her affidavit generated after the motion was filed. Yes. And that's a separate issue from what I want to ask you about now. Now, with respect to any accommodation for her, all this record shows is that she could either continue in the job she had or there was nothing else. Is that true? Well, yes, in a way. The accommodation issue is more complicated than that because there is one level of analysis which is, well, a way to accommodate her would have been to allow her to continue to work in her existing position for which she was qualified and it showed she could perform. Okay. And had for more than a year. Yes. And if we look at the issue of did they decide to eliminate that position or not or, as Ms. Kinney testified, was she merely told there was some jockeying of positions? Yes. Then that is a reasonable accommodation, I would submit. If you assume that the position was going to be eliminated, the accommodation question is still an open question that deserves a trial before a jury because there was no attempt by the defendant to engage in any kind of interactive process here to determine whether there was another position or another structure under which the plaintiff could continue employment. Well, at this stage, this record does not suggest anything else she could have done, does it? She either was going to work at night or she was going to work in the day or they were going to create a new job for her, right? Well, on the record, yes. But, Your Honor, what I would say about that is in this case, the defendant completely ignored its obligation to engage in an interactive process and the trial court completely ignored any obligation for the defendant to do this. What the defendant said in response to that was in the meeting in which Ms. Kinney was told that, well, you can't work this new job and we eliminate your old job so you're out of here. And just as an aside, I would remind the court, this is another piece of evidence that gives an inference drawn in her favor that she had never been told that this job was eliminated before that moment because when she was told that, she became physically ill and had to leave the room. Now, if a week before she'd been told your job's eliminated but bring us a doctor's note, I would submit she's not going to walk out of the room and get sick to her stomach. But back to the issue of accommodation, what the defendant has said is in that meeting, the HR professional said to her, can you think of anything else? She's in shock. She's physically ill when she comes back in the room. And the defendant would ask this court to hold that that satisfies the obligation to engage in an interactive process here for accommodation. To ask the fired employee at the moment of the firing, can you think of anything else? And if you can't right now, under stress, without any kind of fair warning... Well, there was no... She, if I had got the record right, she agrees there was no accommodation possible for the nighttime shift. I would agree as to the nighttime shift. Okay, so what other possible reasonable accommodation does the record suggest other than creating a new job? Well, there... On the one hand, there is the accommodation of keeping her in her same position, which is... Which would, at that point, be creating a new job. Um, but... Well, I submit it's not creating a new job. But there's also case law that talks about, in the accommodation process, you take a look at various kinds of structures that can be... I thought your argument was that, initially, that her original job was eliminated. Do you have evidence to show that it was eliminated after she turned down, said she couldn't handle a night job? That is the primary argument that we make, which is... Yes, yes, you make it. So your argument has got to be that the accommodation could have been the original job that she had. Yes, that is the easiest answer. But, Your Honor, why... Why do you give us the hardest one? Well, because in the event that the court wishes to affirm the trial court in concluding that the disputed facts on the elimination of the position are the defendant's version, even if you do that, the accommodation claim can still survive. Because even if you assume that the position was going to be eliminated, the decision was made before any disclosure of the disability, what else could be done there? Now, case law talks about, as alternatives, looking at the possibility of other positions that may become open in the future, various other types of structures that can happen. The opportunities for accommodation are essentially infinite. But the reason why the record here is devoid of any kind of opportunity to talk about that is because the defendant didn't do a thing in the interactive process to pose possible accommodations. Well, like I'm saying, I just... If you could help me, I mean, Judge Patterson's observation aside, other than the night shift, there is no accommodation for. Uh, there's no evidence that Kenny was qualified for a reporting position. Right? Uh, correct. All right. So what else that existed could have been a reasonable accommodation? Well, there were various other writing positions. I mean, if you look at what happened with her role with the claim the position is eliminated, essentially what they did was hire another person and then divide her job into two and give parts of it to an existing employee and a new employee. And her satisfactory performance in any kind of writing position, that's still available. There are multiple writing positions that are available at the television station. And I guess the significant legal issue here is... Before we even get to whether there are positions she could fill, it is that the defendant failed to even... initiate the process in any effective way, in any kind of way that meets the minimum threshold requirement of the statute to interrupt. What do you say that the obligation was that it failed to do, having said that you have any ideas? And she... Miss Kenny was around the station for another several weeks. Um, and... Was there any exchange of ideas or any statement? So what is it that the law requires the station to have done that it didn't do? Your Honor, I think the law requires that the employer take an active role in engaging the employee. That's fine, but what I'm saying, just trying to be specific if you're writing this thing, what do you write that it had an obligation to do that it didn't do? It said if you've got any ideas, you know, basically holler. Sit down with her and go over the various jobs that are available, look at security. But there weren't any, that's the point. Pardon? There weren't any. Well, that's... I think that is getting to the question and assuming an answer that we don't get to unless the defendant actually fulfills its obligation and initiates the interactive process. Okay. An analogy... Now, even in retrospect, after all this time, nobody is suggesting what they could have done. Now, are you saying that the law would require them and would require this Court to say you have failed in your duty to discuss accommodation even though we know it's a dead end? Would we say that? If we know it's a dead end, are we going to say yeah, but you have to go through the ritual? Well... Now, that's... I'm not saying necessarily that we've concluded that it's a dead end, but you have suggested nothing to the contrary. And this record doesn't suggest anything to the contrary. And once we get beyond the daytime job that she had, where do we go from there? Nobody has outlined anything yet. Here's an example. What you're saying is that an employer that followed the law in the Americans with Disabilities Act would have sat down had the human resources person sit down with your client and let's say well, look, we're a big company. We understand now you have this problem. Now, here are the different jobs that we have in this company here. Which of these do you think you could handle and talk about it that way and not just say, well, you got any ideas? And that's your whole thing, isn't it? To conclude, I would say the law must require some creativity and initiative. Do you agree with me or not? Well, I... I don't if you're saying that that satisfies the employer's obligation. Because I would submit that the law would require some effort of an employer, not a stonewall. And that's what happened here. Not a what? A stonewall. I didn't say that. I mean, you don't listen to me. I didn't say that. I said you get a sympathetic person sits down with her and talks about her problem, see what they can find to help her. That's what the law requires. Yes. I do agree with you. Now, Mr. Turner, would you like to answer Judge Levy's question? Which... Was are we obliged to write about a dead end? The... If there was a fully developed record with a set of facts that could not lead to any different conclusion about whether there was a position available or an accommodation available, yes, I would probably agree with you because that might be... If you could prove it's a fruitless endeavor, but I don't think we got to that point in this case. Thank you. Good morning, Your Honors, and may it please the Court. I'm Dennis Westland. I'm here on behalf of MS Operating Company. That's the parent of Coin TV, which is the station that is at issue here. I do agree with Mr. Turner on two key points, and that is that the real two fundamental issues in this case are the timing of Coin TV's decision to eliminate Ms. Kinney's position, and then whether there was a reasonable accommodation that was possible that would have allowed her to take the position that was open to her. Although... He makes a forceful argument that the key factual inquiry that was weighed rather than resolved adversely to you was the financial document that was prepared after. What is your response to that? I'd like to... It is a good question. I'd like to address that. The evidence in the record, and this is the only evidence in the record on this point, is that Coin TV produces its financial records sometime after any decisions about staffing are made. And if we look at the actual documents, and they're in the record and they're supported with the affidavit of General Manager David Lipoff, it's at the excerpts of record 114 and 115, that bears out. There are employees who are still on the budget because... But even though they're no longer employed at Coin TV. And as you, Judge Reimer, indicated, they're placeholders in the budget. And there was one employee, a Mr. Peck, who was in the budget even though he had been... He had resigned several weeks before the budget was created. The fact that Ms. Kinney was still in the budget was explained by Mr. Lipoff. His testimony that there is a time lag, not just at Coin, but generally within the industry as a whole, is Well, there may in fact be a time lag, but I trust there is nothing that requires that there be a time lag. It's inattention or inadvertence. Is it not? If it were accurate on the day it was prepared, it wouldn't show that, would it? Well, granted, Your Honor, it's not an accurate reflection of the actual... And the goal is accuracy, I take it. The goal is not to say, well, we're not going to change these line items until X days after the event. The goal is accuracy, is it not? I would submit that the goal of the financial statements is less to show which individuals are filling which positions at the station, but rather to show what the station's outlay for personnel is going to be. Well, then it could put X in there instead of the name of a human being. They could, but it makes more sense to the station managers who work with the budget to show the people. You're saying that this would not support any finding coupled with her testimony that nothing was said to her about the elimination... Her testimony contradicts the agent or representative of the employer about whether or not the position had been terminated. She testified she was not told that. Am I right? I disagree that her testimony contradicts that. Yeah, but she did say that. She said that. She did say that she was not expressly told that her position was being eliminated until after she disclosed her limits. That's correct. But she did admit she was told a couple things about what was going on in the budgetary process. She knew and admitted that COIN was going through some budget cuts. She admitted that in the first initial meeting, she was told by her manager, April Thomas, that there would be some jockeying of positions at the station. She was also told in that meeting and admits that Ms. Thomas told her that the show that she was producing, its future was in question. It was up in the air. Then Ms. Thomas told her the good news in all of this, in all of these budget cutbacks and all of the turmoil at the station, the good news for you, we have a position for you. It's even an advancement in your career. It's the producer of the morning news show, but you're going to have to work overnight. It was only then that she disclosed that she had lupus. Now, it kind of flies in the face of logic, given what was going on at the station at the time, that Ms. Thomas would have to go out and lead with the bad news for Ms. Kinney and say, I'm sorry, I have some really bad news. We're eliminating your position. But guess what? There's good news after all. Of course, Ms. Thomas wouldn't do that. It's just not a good management practice. She went out, gave the good news that she was expecting Ms. Kinney to be excited about. And the undisputed evidence in this case is that COIN and its managers, including Ms. Thomas, Mr. Lipoff, were looking very hard to find a way that they could reduce positions in the budget and yet keep everybody that was at the station. So, of course, Ms. Thomas was viewing this as an opportunity for Ms. Kinney and presented it as such. I don't think it is a... But isn't that an argument you make for the trier of fact? Your Honor, I don't believe so because I don't think a reasonable trier of fact could conclude simply from the order of things, the order in which Ms. Thomas gave Ms. Kinney the news from that order alone that that would be a reasonable inference. That's an argument you're making. She's got her argument. I know, but I think the standard here is can a reasonable fact finder infer from that record that because Ms. Thomas simply gave her the good news first and not the bad news first from that simple fact that all of the undisputed evidence from Mr. Lipoff, from Ms. Thomas, from Ms. Steadman, and from Ms. Kinney herself, that we should discount all of that just because of the order of things that Ms. Thomas said. I don't think that's a reasonable inference. I don't think a reasonable fact finder could conclude anything else about the timing of events here other than that the decision was made before she disclosed her lupus. Well, if it was, then why didn't those financial records show it? Well, once again, I think we have to go back to the unrefuted testimony of David Lipoff. The financial records, they're prepared by an accountant. They're not prepared by the managers who are making personnel decisions. That accountant is not informed up to date of personnel decisions that happened a few days prior. And, of course, there's a time lag in the budget documents. Well, that doesn't mean the prior fact has to believe it. But I don't believe it's a reasonable inference from that. Well, we know that a lot of these figures, all you got to do is read the newspapers, are jockeying around. Right? You read about it all the time. I'm not going to make any comments about the quality of my client's financial documents, but I do know what Your Honor is referring to. Yeah. And your company's in big trouble now, isn't it? Excuse me? What was that, Your Honor? Nothing. I just think to rely on that and to just discount the unrefuted testimony would require just massive amounts of speculation. And to require speculation for a claim to survive summary judgment is just not the standard of this in any court. And I think that's what Mr. Turner and Ms. Kinney are asking this court to do, is to speculate and to allow claims that have no supporting evidence to go forward to adjourn. If Your Honors have no further questions on the timing of events, I'd like to address some of the things that Mr. Turner has pointed out about the accommodations that were provided. First off, Judge Reimer, I think you're absolutely correct on this, that Ms. Kinney's burden here is to show that there was a position at Coyne that she could perform, with or without Ms. Kinney. And that's what she has to show to this court, and that's right from this court's decision in the Barnett case. I think Mr. Turner has taken some liberties with the record as to Coyne's role in the interactive process. And the record before the court, and the undisputed facts here, are that Coyne really did engage in that interactive process and do everything that we would expect and hope for an employer in its position to do. And first, they did sit down with Ms. Kinney, and they did ask her, is there anything that you can suggest that would allow you to take the position as the overnight producer? And Ms. Kinney admits she was able to offer nothing. She also admits Coyne left her in her former position for three more weeks. Three weeks in which she could have come up with any reasonable accommodation suggestion that she would have had. She knew who to go to, they were there, they were open. And yet, in the intervening three weeks, she offered nothing. What is also undisputed is that even when Ms. Kinney wasn't engaging in the interactive process, Coyne and its managers and its HR department were. Ms. Thomas went to Coyne's corporate parents, HR department, and asked them, hey, we've got an employee, we really want to keep her. She can't work the night shift because she has lupus. Do you have any suggestions? And the corporate HR department wasn't able to offer any suggestions. They kept her position open for three weeks. They were open to talk to Ms. Kinney. And the result of this, I believe this is undisputed, there is nothing that would have allowed Ms. Kinney to take the overnight job. Now, Ms. Kinney is arguing that a reasonable accommodation would have been to allow her to continue in her previous position. But I think that is tantamount to creating a new job for Ms. Kinney. That position had been eliminated and the analysis should not focus on what she could have done in a position that no longer existed, but really could she perform the essential functions of the one job for her that did exist? The EEOC guidance on this issue, which this court has looked to that guidance in many issues, I don't know that this court has looked to the EEOC or had occasion to rule on whether it is a reasonable accommodation to create a new job, but the EEOC guidance says that it's not. And every circuit court that has taken up that issue so far has agreed with the EEOC and we cite those cases in our brief. And I would submit it's simply not a reasonable accommodation for Ms. Kinney to have stayed in her old job. Furthermore, that was never an accommodation that she requested while she was employed at Coyne. Mr. Turner suggested that there were other positions that were open at Coyne, some writing positions. There's, again, I think he's taking some liberties with the record on that point. I'm not aware that there is any record evidence of other positions being open at Coyne, with the exception of one. It was a combined writer-reporter position that was created in the consolidation of positions that eventually led to the elimination of Ms. Kinney's former position. The undisputed evidence on that point is that Ms. Kinney was not qualified to act as a reporter. She lacked the requisite training in reporting. She had no experience in that. So the one position at Coyne that the plaintiff has been able to point to and say, I was, here's a position for me, she also admits she was not qualified to perform. So there was simply nothing out there for her to do. Thank you. Your Honors, I think I've addressed everything that Mr. Turner raised in his arguments. There's many other issues in this case, as I'm sure you're aware, and I'd be happy to answer any further questions. We have focused on only two issues. Now, it's difficult for me to see if either of those two issues are decided against you. Do we have to get to the issue of whether or not she was in fact disabled or perceived to be disabled? After this doctor wrote a letter, saying she couldn't work nights because of, or at least he counseled against it, certainly, and after they were told that she had lupus and she couldn't work at night, are you saying that they didn't perceive her as disabled? You're correct, Your Honor. Our position is that they did not perceive her as disabled. Okay. And the only evidence on this point about the station's perception of her is that they perceived her Well, let me back up. The facts in the record on that are that Ms. Kinney told Ms. Thomas I have lupus and because of that I cannot work the overnight shift. The only evidence on the point then is that Ms. Thomas agreed. Wow, if that's the case, then I agree. No, she asked, get a letter. Get a letter from your doctor. And the plaintiff supplied a letter a day or two later. Still, they don't perceive her as disabled. Is that what you're saying? All that the letter and Ms. Thomas' agreement with Ms. Kinney would show is that Ms. Kinney was not able to work the overnight shift and that Coyne understood that. For Coyne to have perceived her as disabled, they would have to perceive her as being substantially impaired in a major life activity. Sleep? Sleep being one and work being the only other possible one. Now, on the topic of work, the plaintiff cites a no case and we're not aware of any that says that not being able to work the overnight shift is a substantial limitation in the major life activity of work. And that's because to prove a substantial limitation in that, in working, you have to be able to prove as a plaintiff that you're precluded from working in a broad category of jobs. And the courts that haven't looked at this question have agreed that simply not being able to work those overnight hours is not a broad class of jobs. And furthermore, from the Sutton case in the United States Supreme Court, if the plaintiff has other avenues in which they can use their talents and use their abilities that are open to them, then they're not disabled and Ms. Kinney could work any position that she was qualified for as long as it didn't require her to work overnight, which was really a very small subset of those positions. So I don't think working was a major life activity in which she was substantially impaired. As to sleep, there is no evidence in the record that she could not follow her doctor's directions and get an adequate night's rest. The only evidence that Ms. Kinney supplied were some vague allegations. And her words were that she suffered some sleep difficulty and some sleep interruption. But there was no quantification of either of those. There was no indication of frequency or duration of the problems that she was experiencing. We agree that sleep is a major life activity, but we vehemently disagree that she was substantially impaired, or at least that she offered sufficient evidence that a rational trial of fact can conclude that. The cases cited by the plaintiff in which the courts have held that an employee was substantially impaired in a major life activity of sleep are very, very different from here. The Head v. Glacier Northwest case is a great example. There the plaintiff testified that because of he could only sleep perhaps five hours per night, and that that led him to be extremely gloggy during the daytime hours. Again, we had quantification of a number of hours that he could sleep and some indication of the effects of the sleep deprivation on his daily life activities. The McAllendon case was another one. There the plaintiff alleged that he suffered  and that there were nights that he was completely sleepless. And even though he tried to shift medications to alleviate that problem, they still continued. That's the type of evidence from which a rational trial of fact could conclude that someone sleeping... You're saying the doctor's letter was inadequate? I would, Your Honor, because the doctor's letter only said, my patient has lupus. That requires her to get regular hours of sleep each night. By the way, there was a note on the bottom that he hand wrote that said, by the way, that means not rotating shift work, and she can't work the overnight shift. But there was no indication that she couldn't mitigate any sleep effects and still get the eight hours of sleep or the seven to eight hours of sleep that the doctor was recommending. And from that, I don't think that we can, or that any trial of fact could reasonably conclude that she was substantially impaired in sleeping. And because there's no indication that Coyne viewed her as being substantially impaired in either major life activity, I don't think that we can conclude that Coyne regarded her as disabled. Or for that matter, that she was actually disabled. Do Your Honors have any further questions? If not, we'll rest on our briefs. And thank you very much. Do you have any rebuttal? Do you have any rebuttal? Well, I still ask you if you have any rebuttal. Well, what do I have to do to send you an engraved invitation? If allowed, I would address the disability issue. The position the defendant takes this year seems to be one that says unless you manifest symptoms while you're employed with us, that you're not disabled. And the Dark v. Curry County case decided last year by Judge O'Scanlan involving a heavy equipment operator who suffered from epilepsy is a good counterpoint to that. This gentleman who operated this equipment, most of the time he's perfectly capable of doing anything anyone else can do. But if he has a seizure, he's got a problem. And there was no question that that was a disability under the Act. In this case, we have lupus that can flare up and impair almost everything you do in life. But we also have record evidence from her testimony that the condition affected sleeping, it affected sitting, it affected standing, it affected walking, it affected lifting, it affected being exposed to the sunlight, all major life activities. So, with or without the doctor's note, I would submit that lupus, in the case of Ms. Kinney, is definitely a disability under the Act. Both an actual disability and, as Your Honor said, a perceived disability. Why would Ms. Thomas ask for the doctor's note if she didn't perceive the condition of lupus as being one that had a substantial effect and impairment on Ms. Kinney's life and ability to work? Thank you. Thank you, Matt. It will be submitted. And we'll take up the next item on the argument calendar. Townsend v. Nike. Townsend v. Nike. Thank you.
judges: Pregerson, Leavy, Rymer